Pursuant to Ind.Appellate Rule 65(D),
this Memorandum Decision shall not be
regarded as precedent or cited before
any court except for the purpose of
establishing the defense of res judicata,
collateral estoppel, or the law of the case.



**FILED**

Jun 21 2013, 5:54 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS:

**ALICE BARTANEN-BLEVINS**
Bartanen Law Office
Salem, Indiana

ATTORNEYS FOR APPELLEE:

**NICHOLAS A. SILER**
DCS, Washington County Office
Salem, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF MINOR CHILDREN          )
ALLEGED TO BE IN NEED OF SERVICES,       )
R.C. and J.C., Minor Children,           )
                                         )
D.S., Mother, and E.S., Stepfather,      )
                                         )
    Appellants-Respondents,           )
                                         )
        vs.            )          No. 88A01-1211-JC-510
                                         )
INDIANA DEPARTMENT OF CHILD              )
SERVICES,                                )
                                         )
    Appellee-Petitioner.              )

APPEAL FROM THE WASHINTON CIRCUIT COURT
The Honorable Larry W. Medlock, Judge
Cause Nos. 88C01-1206-JC-134; 88C01-1206-JC-135

**June 21, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

D.S. (Mother) and E.S. (Stepfather) (collectively, Appellants) appeal the adjudication of Mother's children, R.C., born July 31, 2002, and J.C., born April 8, 2004, as Children in Need of Services (CHINS). Appellants present two arguments,[1] which we consolidate and restate as whether the Department of Child Services (DCS) presented sufficient evidence the children were CHINS. We affirm.

**FACTS AND PROCEDURAL HISTORY**

On May 14, 2012, DCS received a report that R.C. and J.C. had marks and bruises on their thighs and buttocks because Stepfather hit them with a belt as punishment. The report also alleged Stepfather recently had punched R.C. in the stomach, causing R.C. to have difficulty breathing. DCS Family Case Manager Deborah Ponder was assigned to the case and spoke with R.C. at her elementary school. R.C. confirmed the accounts in the report. That evening, Ponder went to the family home and found the children were home without adult supervision. Ponder contacted Mother and Stepfather and they eventually returned home. Once they arrived, DCS took the children to an emergency room for medical evaluation.

Angie Motsinger, RN, and Dr. David Britt examined the children, who had bruising on their right posterior thighs: R.C. had four separate markings ranging in size from eight and

---

[1] In addition to their sufficiency argument, Appellants argue, citing *In the Matter of E.H. and L.H.*, 612 N.E.2d 174, (Ind. Ct. App. 1993), *reh'g denied*, "the CHINS statute, including its jurisdictional trigger, is a way for the government to respond emergency situations involving children unlikely to be helped without court intervention." (Br. of Appellants at 9.) However, *In the Matter of E.H. and L.H.* is distinguishable because our court's holding applied to those cases in which the court's jurisdiction under Uniform Child Custody and Jurisdiction Act (UCCJA) was in question. That is not the case here, and therefore we reject Appellants' argument.

one half centimeters to the size of a quarter; and J.C. had two markings, one in the shape of a "J" and another the size of a quarter. The children reported the injuries were a result of Stepfather hitting them with a belt as punishment for not completing their chores.

Stepfather admitted he hit the children with a belt. He agreed to leave the home at DCS' request, but was allowed back after he and Mother agreed corporal punishment would not be used on the children.

On July 6, DCS filed a petition alleging the children were CHINS. On July 24, the juvenile court held a hearing during which Appellants denied the CHINS allegations. On September 25 and October 9, the juvenile court held fact-finding hearings. On October 16, the juvenile court adjudicated R.C. and J.C. as CHINS.

## DISCUSSION AND DECISION

A CHINS proceeding is civil in nature, so the State must prove by a preponderance of the evidence that a child is a CHINS. *In re N.E. v. IDCS*, 919 N.E.2d 102, 105 (Ind. 2010). The CHINS petition in the instant case was filed pursuant to Ind. Code §§ 31-34-1-1 and -2(a), which state, respectively:

> Sec. 1. A child is a child in need of services if before the child becomes eighteen (18) years of age:
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>> (2) the child needs care, treatment, or rehabilitation that:
>>> (A) the child is not receiving; and
>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.
> Sec. 2. (a) A child is a child in need of services if before the child becomes

3

eighteen (18) years of age:

> (1) the child's physical or mental health is seriously endangered due to injury by the act or omission of the child's parent, guardian, or custodian; and
> (2) the child needs care, treatment, or rehabilitation that:
>> (A) the child is not receiving; and
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

A CHINS adjudication "focuses on the condition of the child," and not the culpability of the parent, *In re N.E.*, 919 N.E.2d at 105, because the purpose of finding a child to be a CHINS is to provide proper services for the benefit of the child, not to punish the parent. *Id*. at 106.

When a juvenile court enters findings of fact and conclusions of law in a CHINS decision, we apply a two-tiered standard of review. *Parmeter v. Cass County DCS*, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007), *reh'g denied*. We first consider whether the evidence supports the findings and then whether the findings support the judgment. *Id*. We may not set aside the findings or judgment unless they are clearly erroneous. *Id*. Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id*. We give due regard to the juvenile court's ability to assess witness credibility and do not reweigh the evidence; we instead consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id*. We defer substantially to findings of fact, but not to conclusions of law. *Id*.

In adjudicating children as CHINS, the juvenile court found:

4. On May 14, 2012 a report was received by the Indiana Department of Child services for Washington Court, through the centralized intake unit. The report alleged that [Stepfather] had "whooped" both children with a belt, leaving

4

marks and bruises.  The report source stated that the bruises were purple and red in color, were about 3-4 inches in length and appeared to be belt-shaped.  The report also stated that the child [sic] were "whooped" because they got into trouble.  The report further stated that [Stepfather] punched [R.C.] in the stomach with a closed fist, and that it knocked her out.

\* \* \* \* \*

5. That [R.C] confirmed to Ponder that [R.C.] has bruising on her thighs and lower buttocks.

\* \* \* \* \*

7. The same day, [Ponder] interviewed [R.C] regarding the allegations.  On that basis, [Ponder] conducted a further investigation by visiting the home at 6:00 p.m[.], after no one was home at 3:45 p.m.  [J.C.] answered the door, and neither parent was in the home.

8. The children did not have a plan for an emergency, besides contacting [Mother], who worked about forty-five (45) minutes away in Louisville.

9. That [Ponder] made telephone contact with [Mother] who advised that she would be home as soon as possible and that [Stepfather] was on his way home from work.

10. At 6:30, [Mother] was contacted by [Ponder] and [Stepfather's] parents came to the home later.  [Stepfather] arrived at the home about 7:00 p.m., and had an odor of alcoholic beverage coming from his person.  [Mother] returned to the home at 7:30 p.m.

\* \* \* \* \*

12. Following this, the children were taken to be seen by staff at St. Vincent's Salem Memorial Hospital.  Angie Motsinger, an emergency room nurse, and Dr. David Britt, the treating emergency room physician on May 14, 2012, examined the children.

13. That [Dr.] Britt stated that neither child complained of any pain.

14. That Angie Motsinger, R.N., testified that it was reported by [R.C.] that one of the bruises entered by D.C.S. as support of their substantiation was caused by her brother, [J.C.].

15. The medical records admitted into evidence show both children reported to Angie Motsinger and Dr. David Britt that they had been spanked with a belt by [Stepfather], and that the observed injuries, in the form of bruising, were consistent with these injuries.  The pictures admitted into evidence, taken by FCM Ponder, also show bruising to the back of the legs consistent with the type of injuries observed.  The Court therefore finds that the children were spanked with a belt by [Stepfather].

\* \* \* \* \*

18. Family members have long had concerns about excessive punishment administered by [Mother and Stepfather], and [Stepfather] admitted under oath, and to Ponder, that he administered corporal punishment with a belt, and

5

gave an explanation that he could not spank the children with his hand because of a wrist injury.

19. On May 15, 2012, [Stepfather] showed FCM Ponder the belt he used to spank the children.

20. The types of injuries exhibited by the children, both in terms of their nature, the children's statements to medical professionals for purpose of treatment and to the family case manager, and based on the observations of family members from past incidents, indicate that the type of observable injuries suffered by the children were non-accidental.

21. [R.C.] had an incident with [Stepfather] approximately two weeks before [the] report was received, where [R.C.] was placed in fear by the wind being knocked out of her. According to [Mother] and [Stepfather], she fell down, but in a text to [Maternal Grandmother], [Mother] called it a "fight or flight moment, like [Mother] has sometimes." [Mother] termed this a case of temporary extreme fear and disorientation.

22. The children physically fight with each other on a regular basis.

23. [Mother] cannot remember the name of [R.C.'s] psychiatrist.

\* \* \* \* \*

27. That [Ponder] acknowledged that [Mother and Stepfather] had been offered an informal adjustment which they had declined to sign.

\* \* \* \* \*

35. [Maternal Step-Grandmother] testified that she had observed some questionable parenting choices including [Stepfather] grabbing the children.

\* \* \* \* \*

37. That [Maternal Grandmother] testified that she had noticed bruising on [R.C.'s] legs.

38. That [Maternal Grandmother] testified that [J.C.] didn't think he had bruising.

39. That [Maternal Grandmother] has observed physical punishment in the past which she finds inappropriate.

40. That [Mother's Brother] testified that he had checked [J.C.] for bruising on May 12, 2012, and seen bruising to his right posterior thigh and lower buttocks.

\* \* \* \* \*

43. That [CASA Director] Kim Grantz testified that the children had missed the school bus the morning of the trial and had walked partially to school and then gotten on another school bus other than their normal route. On the date of the hearing, the children attempted to walk to school when they stopped a bus by banging on the door, and then got on the bus. [Stepfather] was not awake at the time, and could not ensure the children got to school properly.

44. That [Stepfather] was in the home at the time of the children leaving for school.

6

(App. at 55-59.) Based on those findings, the juvenile court concluded:

7. Because of the injuries suffered by the children and the injuries observed by medical professionals including Dr. Britt and RN Motsinger, the corporal punishment administered to the children was not reasonable. This is both based on the children's ages, the lack of success in the punishment in terms of correcting behavior, and repeated concerns expressed by family members.

8. The Court found that [Stepfather] had spanked the children with a belt, leaving bruises, but even if the Court could not determine this causation and chose to believe the testimony of the parents, the injuries were not accidental, and would not ordinarily be sustained except for the act or omission of the child's parent, guardian or custodian. Since [Stepfather] lives in the same house with the children and is responsible for care, [sic] and supervision of the children, he would be considered a custodian under the Indiana Code.

9. The coercive intervention of the Court is necessary to provide services to the family on the basis that the parents have failed to agree on any sort of voluntary services with the Department, in terms of an informal adjustment. [Mother and Stepfather] have stated that they have attempted to abide by a safety plan and to get proper mental health treatment for the children, but [Mother] is even unable to remember the name of the psychiatrist for [R.C.]. There also has been a refusal to allow the Department access to the children while this matter has been pending, and the Court is allowed to take judicial notice of its [own] records in these proceedings.

(*Id*. at 61-62.)

Appellants argue "the State failed to present evidence that proves that the children's physical or mental condition was seriously impaired" by Appellants' actions (Br. of Appellant at 8). However, DCS presented evidence both children had ADHD, and thus corporal punishment was not an effective way to address the children's behavior. In addition, FCM Ponder testified the children had been exposed to violence, and their violent behaviors, such as fighting with one another, stemmed from that exposure. Appellants also argue DCS did not present evidence there was a history of family violence. On the contrary,

7

DCS presented testimony from several family members about past violence against the children, including the existence of bruises on the children's legs and arms and incidents where the children were smacked, punched, or thrown as punishment.

Appellants also argue DCS intervention was not required because they had sought medical treatment for J.C.'s ADHD, however, FCM Ponder testified she was concerned the children were not receiving proper care for the ADHD because Mother could not remember the name of R.C.'s psychiatrist. Appellants further argue DCS intervention was not required because the Appellants had ceased corporal punishment. However, DCS presented evidence both Mother and Stepfather refused to participate in and sign an informal adjustment plan, which would address the use of corporal punishment and its alternatives, until ordered to do so by the court. Finally, Appellants argue DCS intervention was not required because the children were in after-school care and thus were not home alone after school. However, there was no evidence Appellants had a plan for times during which children were not in school and Appellants were unable to care for them.

Appellants' arguments are invitations for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See Parmeter*, 878 N.E.2d at 450 (appellate court does not reweigh evidence or judge the credibility of witnesses). Accordingly, we affirm the juvenile court's decision.

Affirmed.

BAKER, J., and MATHIAS, J., concur.